UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | | |
|---|---|---|
| **ADEM ARSLANI** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **UMF GROUP, INC.**, a Colorado corporation | ) | |
| | ) | |
| Serve: Colorado Registered Agent LLC | ) | |
| 1942 Broadway Street, Suite 314c | ) | |
| Boulder, Colorado 80302 | ) | |
| | ) | CIVIL ACTION NO. _____ |
| and | ) | |
| | ) | |
| **JOHN T. ROOT, JR.** | ) | |
| P.O. Box 701 | ) | |
| Greenbrier, Arkansas 72058 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **SEAN ROSS** or **JOHN DOE Defendant** using | ) | |
| name "Sean Ross" as an alias | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**VERIFIED COMPLAINT**

Plaintiff, Adem Arslani ("Arslani" or "Plaintiff"), for his Verified Complaint against

Defendants, UMF Group, Inc. ("UMF Group" or the "Company"), Sean Ross or John Doe

Defendant using the name "Sean Ross" as an alias ("Ross"), and John T. Root, Jr. ("Root")

(collectively, the "Defendants"), hereby states as follows:

**Nature of the Case**

1. As set forth below, from in or around late 2016 through February 2018 (the

"Relevant Period"), Defendants, UMF Group and Ross, the purported President, Secretary, Chief

Executive Officer, Chairman of the Board, and sole Director of the Company, and Root made a series of false and misleading public statements to effectuate an unlawful "pump-and-dump" scheme in which they caused UMF Group's stock to be fraudulently sold to investors, including the Plaintiff. Specifically, Ross and other unknown conspirators employed various promotional campaigns designed to artificially inflate the market price of the shares of UMF Group stock (the "pump" phase). Using these manipulative techniques, Ross and other unknown conspirators directly or indirectly dumped their shares into the securities markets and generated millions of dollars of fraudulent stock sale proceeds (the "dump" phase).

2.      Defendant Root, in furtherance of this scheme, knowingly or recklessly prepared and published attorney letters which contained material misrepresentations, misleading statements, and omissions of material fact concerning Ross and UMF Group's financial statements, operations, and management.

3.      In reliance on the Defendants' false and misleading statements, Plaintiff purchased UMF Group stock on the over-the-counter market. As the Defendants' fraudulent scheme was revealed, the stock price of UMF Group dropped precipitously and Plaintiff suffered monetary damages as a directed result thereof.

## Parties

4.      Plaintiff Arslani is a citizen of the United States and a resident of McHenry, Illinois. He purchased common stock of UMF Group on the dates and in the amounts set forth in Exhibit A attached hereto.

5.      Defendant UMF Group is a Colorado corporation in bad standing with the Colorado Secretary of State, purporting to have or have had its principal place of business located at 1942 Broadway Street, Suite 314, Boulder, Colorado. On information and belief, UMF

Group's securities are still publicly traded on the over-the-counter market under the ticker symbol "UMFG." UMF Group formerly conducted business under the names South-Mont Corporation, Black Cat Entertainment Corporation, Mobile Airwaves, Inc., and American Community Development, Inc.[1]

6.      Defendant Sean Ross or John Doe Defendant using the name "Sean Ross" as an alias, on information and belief, purports to be a resident of Vancouver, BC, Canada. Ross is the purported President, Secretary, Chief Executive Officer, Chairman of the Board, and sole Director of UMF Group.

7.      Defendant John T. Root, Jr., on information and belief, is a citizen of the United States and a resident of Greenbrier, Arkansas, and a member of the Arkansas bar. At all relevant times alleged herein, Root held himself out as a licensed attorney who was permitted to practice before the United States Securities and Exchange Commission ("SEC").

## Jurisdiction and Venue

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78aa(a)].

10.     This Court has personal jurisdiction over each of the Defendants because at all relevant times alleged herein (i) UMF Group was a Colorado corporation that transacted business

---

[1] The Company changed its name to UMF Group on February 2, 2017. For the purposes this Verified Complaint, however, "UMF Group" will refer to the Company at all relevant times alleged herein regardless of the Company's name at any specific time.

in the State of Colorado, (ii) Ross held himself out as the President, Secretary, Chief Executive Officer, Chairman of the Board, and sole Director of the Company and transacted business in the State of Colorado, and (iii) Root has transacted business with Ross and the Company in the State of Colorado.

11.     Venue is proper in this Court pursuant to pursuant to Section 27(a) of the 1934 Act [15 U.S.C. § 78aa(a)] and 28 U.S.C. § 1391(b). UMF Group maintains its principal offices and conducts and/or has conducted a substantial amount of its business in the District of Colorado, and a substantial part of the acts, practices, transaction, and courses of business alleged in this Verified Complaint occurred within the District of Colorado, and were effectuated, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails.

## **Statement of Facts**

### Before the Relevant Period

12.     UMF Group is a publicly traded company that was incorporated in Colorado in 1988. Prior to the Relevant Period, the Company was engaged in the business of oil and gas exploration.

13.     In 2011, the Company became delinquent under the laws of Colorado for failing to file periodic reports with the Colorado Secretary of State. Around that same time, the Company ceased publishing financial and other corporate disclosures on the OTC Markets website.[2] According to all publicly available documents, it appears that the Company had little-to-no business operations from 2011 until the Relevant Period.

---

[2] *See* numerical paragraph 19 herein.

14.     Furthermore, prior to the Relevant Period, Defendant Ross was **never mentioned in any of the Company's filings or disclosures**. Based on the information available to the Plaintiff, it appears that Ross was in no way affiliated with the Company prior to the Relevant Period.

15.     Then, on October 26, 2016, Ross filed with the Colorado Secretary of State a Statement Curing Delinquency. Concurrent with this filing, Ross filed a Statement of Correction naming himself as the Company's new registered agent.

16.     Shortly afterwards, on January 17, 2017, the Company published on the OTC Markets website **all** of the purported annual and quarterly financial reports of the Company from the periods ended December 31, 2011 through December 31, 2016. Aside from the dates and other miniscule changes on the balance sheet of the Company, each of the financial reports published on that date are virtually identical.[3]

17.     According to the Company's 2016 Annual Report published on the OTC Markets website, Defendant Ross was appointed President, Secretary, Principal Executive Officer, Chairman of the Board of Directors, and as a Director of the Company in December 2014. Further, the report stated that Ross was issued 210,000,000 shares of the Company in exchange for services on December 6, 2016. These shares represented a 51.2% ownership of the outstanding shares of the stock of the Company.

18.     Based on the foregoing, and despite the fraudulent means of obtaining such management positions and a majority ownership of the shares of the Company, Ross was and

---

[3] In fact, some of the Quarterly Reports published for periods ended in different years are the *exact* same, including the dates. For example, the Quarterly Report published for the period ended March 31, 2014 actually provides that it pertains to the period ended March 31, 2015. Indeed, the Quarterly Report published for the period ended March 31, 2015 is a carbon copy of the Quarterly Report published for the previous year.

still is a "control person" for UMF Group for purposes of the Exchange Act and the Rules

promulgated thereunder.

Defendant Root's First Attorney Letter

19.     A company whose stock prices are quoted on the OTC Markets Group website is

required by OTC Markets to periodically publish letters from an attorney retained by the

company that provides investors and potential investors certain information regarding the

company, its officers, directors, and its financial statements ("Attorney Letters"). During the

Relevant Period, Defendant Root was retained as outside securities counsel by Defendant Ross

for the purpose of submitting Attorney Letters on behalf of the Company.[4]

20.     On information and belief, Root signed an agreement with OTC Markets

providing that the information in any of his Attorney Letters would be made available on the

OTC Markets website for review by the investing public:

> "The letter will be posted by the Issuer, and will be published,
> accompanying the Issuer's disclosure, through the OTC
> Disclosure & News Service….These materials are relied upon
> by public investors making their investment decision."

Thus, Root was aware that his statements and opinions would be relied upon by investors and

potential investors. (A true and accurate copy of the Attorney Letter agreement form executed by

Root is attached hereto as Exhibit B.)

21.     On January 25, 2017, Root posted his first Attorney Letter for UMF Group on the

OTC Markets website (the "First Root Letter"). The First Root Letter was drafted on Root's

---

[4] OTC Markets lists securities in tiers based on based on the quality of the disclosure provided by the publicly traded company. UMF Group was listed in the "Pink" tier, which are generally considered to be highly speculative securities. Within the "Pink" tier, securities are divided into three categories: "Current Information," "Limited Information," and "No Information," or "Dark" companies. To qualify for the "Current Information" category, an issuer must provide sufficient public disclosure in accordance with the OTC Pink Basic Disclosure Guidelines, which require the submission of an Attorney Letter that addresses certain topics related to the issuer. Such Attorney Letters are made available to the public on the OTC Markets website.

letterhead, identified the contents of the Letter as his opinions, was personally signed by Root, and was forwarded to Ross with the intent and understanding that the Letter would be posted by the Company on the OTC Markets website. (A true and accurate copy of First Root Letter is attached hereto as Exhibit C.)

22.     The First Root Letter purportedly "relied on publicly available information from the Secretary of State of the State of Colorado and information obtained from the Company's officers and directors." Root noted that, "according to the [Colorado Secretary of State's] website, the Corporation is in good standing." Root failed to note, however, that the Company had been delinquent for the previous 5 years and was only just reinstated by a purported registered agent who had never before been affiliated with the Company. Although it was technically true that the Company was in "good standing" with the Colorado Secretary or State at the time, Root was aware that the statement was misleading because he had actual knowledge that the Company had been delinquent for several years up to the date of Letter.

23.     Root also claimed that in connection with the preparation of the First Root Letter, he reviewed UMF Group's unaudited financial reports for each of the periods ended December 31, 2011 through December 31, 2016. These unaudited financial statements date back to when the Company ceased publishing its financial reports in 2011. Notably, Root reviewed only the Company's purported financial statements that were prepared by Defendant Ross.

24.     The First Root Letter states that the person responsible for the preparation of the Company's 2011-2016 financial statements is Defendant Sean Ross. However, according to the Company's 2016 Annual Report, Ross was not affiliated with the Company until December 2014.

25.     Root also represented that:

Ross has extensive experience in the oil and gas industry for 20 years. Mr. Ross worked with multiple private Oil & Gas companies as a consultant of Business Development to develop and manage fundraising in the Shale plays. Mr. Ross also focused on the midstream and service side of the energy business. He began his career with Shell Exploration & Production as a surveyor in their West Coast division. Subsequently, he held numerous positions of increasing responsibility within Shell Exploration & Production and was named the Area Manager for their Rocky Mountain exploration assets. Mr. Ross is familiar with all material aspects of reporting and of the operations. He is, in my opinion, qualified and competent to prepare the financial statements and disclosures.

This representation is completely false.

26.     The Attorney Letter agreement Ross executed with OTC Markets provides that Ross "must…personally [meet] with management and a majority of the directors of the Issuer." However, Ross's letter admits that he merely spoke "with a majority of the management and Directors of the Company via tele-conference and emails."

27.     The First Root Letter also identifies Janice Shahsavar as a control person and beneficial owner of 55,000,000 shares of the Company who assisted, prepared, or provided information with respect to the Company's disclosure. Root's statement is false because he never spoke with Ms. Shahsavar. Ms. Shahsavar was a shareholder of the Company prior to Ross's illegal takeover. In fact, by letter via counsel dated March 16, 2018, Ms. Shahsavar demanded that Corporate Stock Transfer, Inc., the stock transfer agent for the Company at the time, produce all copies of documents relating to services performed for the Company during the Relevant period. Ms. Shahsavar explained that neither she nor any other shareholder, officer, or director of the Company had ever met or heard of Sean Ross. She described Ross's actions as an "illegal hack and corporate takeover of the [C]ompany]…accomplished through, among other things, apparent forgeries and multiple instances of securities fraud, not to mention of securities laws

violations." (A true and accurate copy of the March 16, 2018 letter from Ms. Shahsavar is attached hereto as <u>Exhibit D</u>.)

28.     Furthermore, the Company's Interim Financial Report for the period ending December 31, 2016 reflects that an entity known as 360 Degree Solution Group of Companies, Inc. possessed a right to be issued 55,000,000 shares of the Company. Yet, the First Root Letter makes no reference to this fact, thereby intentionally obfuscating the fact that other persons had valid claims to ownership of the Company that would have negated Ross's purported majority ownership of the Company's stock.

29.     Root knew, or was reckless in not knowing, that his above-referenced representations and omissions of material facts were false and misleading.

30.     Root knew that the First Root Letter would be posted on the OTC Markets website for review by the investing public. In the Letter, Root states that "OTC Markets…is granted full and complete permission to and rights to publish this document via the OTC Disclosure and News Service for viewing by the general public and regulators. The public and OTC Markets may rely on the above in determining whether UMF Group [sic] has made adequate current information publicly available…."

31.     Root's false and/or misleading representations and omissions of material facts were made in connection with the purchase or sale of securities because Root wrote the First Letter in order that UMF Group stock prices could be quoted by OTC Markets and used in over-the-counter trading.

32.     UMF Group had only been recently reinstated with the Colorado Secretary of State at the time of the First Root Letter, had been "dark" for years prior to such reinstatement by an unknown shareholder, and appeared to have virtually no operations during that time. Further,

UMF Group was a thinly-capitalized, penny stock company without audited financial statements and whose securities were being traded in unregistered transactions. Moreover, in violation of the terms of the Attorney Letter agreement with OTC Markets, Root failed to meet with Ross or any other shareholders in person. Under these circumstances, Root's false and/or misleading statements and omissions were material because a reasonable investor would have considered the correct information important in making his, her, or its investment decision.

The Reverse Stock Split and Medical Marijuana Business

33.     On February 2, 2017, the Company changed its name from American Community Development to UMF Group. Concurrent with the name change, the Company announced a 500 to 1 reverse stock split of the shares of its common stock. The result of the reverse stock split would reduce the number of outstanding shares of stock of the Company from 410,410,102 to 820,820 shares outstanding. Of the 820,820 shares outstanding, Ross would own 420,000 shares.

34.     The reverse stock split took effect on February 23, 2017. **The next day, on February 24, 2017, at the direction of Ross, the Company issued Ross an additional 65,000,000 shares "for services."** In effect, Ross had fraudulently reduced the number of shares owned by legitimate and unknowing shareholders of the Company, only to turn around and grant himself virtually complete ownership of UMF Group. Specifically, Ross owned 65,420,000 of the 65,820,820 shares issued and outstanding after the reverse split, equating to a 99.4% ownership stake in the Company.

35.     Soon afterwards, on March 8, 2017, four unnamed shareholders were each issued 3,000,000 shares "for debt," totaling 12,000,000 shares. Again, on March 16, 2017, three unnamed shareholders were each issued 3,000,000 shares "for debt," totaling 9,000,000 shares.[5]

---

[5] The 21,000,000 shares were issued at $0.001, i.e., for $21,000. Notably, the balance of a $25,000 non-interest bearing promissory note held by "Galaxy Financial Management Corp." was reduced by $21,000 to $4,000. On

Significantly, due to the 65,000,000 shares issued to Ross weeks prior, the 3,000,000 share issuances to each of the unnamed shareholders each accounted for just less than 5% of the outstanding shares of the Company, the amount required to be reported with the SEC under Section 13(d) of the Exchange Act.

36.     Sometime between the Company's 2016 Annual Report and the first Quarterly Report published in 2017 on the OTC Markets website on May 13, 2017, UMF Group purportedly changed its business from oil and gas exploration to medical marijuana. Specifically, as described in the Quarterly Report published on May 13, 2017 (for the period ended March 31, 2017):

> UMF Group Inc. is an innovative Medical Marijuana company, which aims to develop and approve proprietary extracts as pharmaceuticals, and to ultimately deliver to the market pharmaceuticals that are highly differentiated both from medical marijuana and from current cannabinoid drugs.
>
> The Company aims to develop and approve proprietary extracs, or "prodrugs" as pharmaceuticals using a low-risk regulatory strategy that is available, and to ultimately deliver to the market pharmaceuticals that are highly differentiated both from medical marijuana and from current cannabinoid drugs.
>
> Utilizing different cutting edge and innovative extraction processes allows us to pinpoint the active canabinoids and glycosides specific to targeted treatment areas of the body. By testing combinations found as they would naturally occur, and then adding or subtracting certain known factors that have been previously proven to yield positive or negative response on the areas being treated, we are able to produce proprietary compounds targeting specific tissues, or organs in the body enabling patients to receive a higher concentration of canabinoids without the psychoactive side effects of THC.

This representation was completely false.

---

information and belief, "Galaxy Financial Management Corp." is a fictitious entity whose name was used to accomplish illegal stock sales by circumventing registration and disclosure provisions of federal securities laws.

37.     UMF Group publicly announced the pivot to medical marijuana on May 23, 2017 via a press release titled "UMF Group Inc. Corporate Update." (True and accurate copies of the various press releases referenced herein are attached hereto collectively as <u>Exhibit E</u>.)

38.     Between May 23 and June 13, 2017, UMF Group, Ross, and other unknown conspirators published several more press releases about the Company's website, testing and research developments, patent applications, growing demand in the medical marijuana industry, and other product breakthroughs. Such promotional materials include, without limitation, press releases titled "UMF Group Inc. Announces Proprietary Extraction Advances" and "UMF Group Inc. Announces Full Spectrum Cannabis Extract Quality Control."

39.     The press releases were completely false and were solely intended to create public interest around the Company and artificially inflate its stock price.

40.     On September 7, 2017, Ross filed with the Colorado Secretary of State an Amended and Restated Articles of Incorporation of UMF Group that, *inter alia*, allowed for the issuance of preferred stock. The preferred stock was convertible to common shares at a rate of 1:250.

41.     On September 11, 2017, Ross caused the Company to issue 500,000 preferred shares of stock of UMF Group to him in exchange "for services."

Defendant Root's Second Attorney Letter

42.     On September 18, 2017, Defendant Root published his second attorney letter regarding the currentness and reliability of UMF Group's financial statements (the "Second Root Letter"). The Second Root Letter addressed the Company's financial information for the period ended June 30, 2017. (A true and accurate copy of the Second Root Letter is attached hereto as <u>Exhibit F</u>.)

43.     The Second Root Letter once again identified Sean Ross as the person responsible for the preparation of the Company's financial statements. Moreover, the Second Letter provided an exact *verbatim* description of Ross's bogus background and experience in the oil and gas industry that Root used in the First Letter, as quoted in numerical paragraph 25 of this Verified Complaint.  Despite the fact that UMF Group had purportedly changed its business from oil and gas exploration to medical marijuana, Root falsely represented that based on Ross's experience in *the oil and gas industry*, "*Mr. Ross is familiar with all aspects of reporting and of the operations*" of a *medical marijuana business*.

44.     Further, again in violation of the Attorney Letter agreement with OTC Markets, Root stated that he merely met with the Company's management "telephonically."

45.     Having purportedly relied on the information provided by Ross and UMF Group's financial statements to date, Root once again opined that the information published in the OTC Markets website was current and reliable. Root knew, or was reckless in not knowing, that his statements, representations, and omissions were false and misleading.

46.     Root knew that the Second Root Letter would be posted on the OTC Markets website for review by the investing public. In the Letter, Root states that "OTC Markets Group, Inc., has full and complete permission to publish this letter through the OTC Disclosure and News Service for viewing by the general public and regulators."

47.     As with the First Letter, Root's false and/or misleading statements and omissions in the Second Letter were made in connection with the purchase or sale of securities because Root wrote the Second Letter in order that UMF Group stock prices could be quoted by OTC Markets and used in over-the-counter trading.

48.     As of the date of the Second Letter, UMF Group had issued a majority stake in the Company to Ross in exchange "for services" just days after being reinstated by Ross with the Colorado Secretary of State. Subsequently, Ross caused the Company to complete a reverse stock split drastically reducing the number of shares owned by all shareholders and then immediately caused the Company to issue him a massive quantity of shares (again "for services") that granted him a 99.4% ownership in UMF Group. Ross then caused the Company to issue another large quantity of shares to various undisclosed conspirators in exchange "for debt." Around this same time, UMF Group purported to change its business from oil and gas exploration to the wholly unrelated industry of medical marijuana. Despite the numerous signs of fraudulent activity on the part of Ross and UMF Group, Root either (i) knew that his statements and omissions were false and intentionally misled investors, or (ii) acted with extreme recklessness in refusing to see the obvious or investigate the highly doubtful.

49.     Further, UMF Group was a thinly-capitalized, penny stock company without audited financial statements and whose securities were being traded in unregistered transactions. Moreover, in violation of the terms of the attorney letter agreement with OTC Markets, Root failed to meet with Ross or any other shareholders in person. Under these circumstances, Root's false and/or misleading statements and omissions of fact were material because a reasonable investor would have considered the correct information important in making his, her, or its investment decision.

<u>Defendant Ross and the Change to the Crypto Security Business</u>

50. On September 22, 2017, Ross caused UMF Group to issue an additional 34,500,000 shares "for debt" that were distributed among six unnamed shareholders.[6] Significantly, the 34,500,000 shares issued and distributed among the six unnamed shareholders would each account for less than 5% of the outstanding shares of the Company, the amount required to be reported to the SEC under Section 13(d) of the Exchange Act.

51. According to UMF Group's disclosure on the OTC Markets website on November 30, 2017, UMF Group announced yet *another* change in its business. Apparently attempting to "piggyback" the public interest in cryptocurrency and its related security concerns that was rapidly gaining momentum at the time, UMF Group purported to move into the business of cryptosecurity, namely, cryptowallets. Specifically:

> On November 3, 2017, the Company entered into an Agreement of Purchase and Sale of Business Assets and IP to acquire BitBao Group Inc. ("BBGI"). BBGI has developed an app called CryptoSecure.
>
> …
>
> Through the acquisition of BBGI, the Company is now developing a crypto currency wallet, "CryptoSecure". The app is in its final stages of beta testing.
>
> …
>
> We strive to be a market leader in the era of a digital world by providing unparalleled security, convenience and service to our users. With a focus on the future, CryptoSecure aims to create and foster long term relationships with clients, partners and our team of R&D innovators to maintain the latest offerings.

These representations were completely false.

---

[6] Similar to the March 2017 issuances of shares to unnamed shareholders for debt, the 34,500,000 shares were issued at $0.001, i.e., for $34,500. Notably, UMF Group's notes payable at this time consisted of non-interest bearing notes with balances of $4,000, $12,500, and $18,000, purportedly held by "Galaxy Financial Management, Inc.," "KK Holdings Inc.," and "Bernelli Management Consultants," respectively, totaling $34,500. Again, on information and believe, the foregoing companies are fictitious entities used solely for the purpose of carrying out the Defendants' fraudulent scheme.

52.     In January and February of 2018, UMF Group, Ross and other unknown conspirators produced several news articles and press releases about the Company, touting its stock and promoting its soon-to-be-released digital wallet mobile application, "CryptoSecure." Such press releases include, without limitation, "Cyber Security and Cryptocurrency: Two Sides of the Same Coin," "UMF Group Inc. Updates Development of HD CryptoSecure Cryptocurrency Wallet Application," and "UMF Group Inc. Discusses the Future of Secure Cryptocurrencies." (*See* Ex. E.)

53.     The promotional materials were completely false and were solely intended to create public interest around the Company and artificially inflate its stock price.

54.     On January 12, 2018, Plaintiff was contacted by an individual named "Stan" from StockProfitReport.com. "Stan" solicited Plaintiff to purchase UMF Group stock on the over-the-counter market. He explained that UMF Group was about to announce its transition to a cryptosecurity company, and that Plaintiff could "get in on the ground floor" and enjoy "significant returns."

55.     Plaintiff visited the OTC Markets website to assess the Company. Plaintiff reviewed the Company's financial statements and disclosures concerning its new product, "CryptoSecure." Plaintiff also reviewed Defendant Root's Letters to ensure that the Company's disclosures were current.

56.     In reliance on the materially false and misleading financial statements prepared by Ross and the Letters prepared by Root described herein, Plaintiff invested in the Company and purchased shares of UMF Group stock on the over-the-counter market. Throughout January 2018, Plaintiff purchased 80,300 shares of UMF Group for a total price exceeding $85,500.

57.     Shortly after Plaintiff purchased the shares of UMF Group, the stock price plummeted. On January 22, 2018, the stock price traded at $1.67 per share. Just one month later, on February 22nd, the stock closed at $0.09 per share. By March 2018, the stock was trading at less than $0.05 per share.

58.     Had Plaintiff been aware of the true state of the Company's financial statements and operations, and of the Defendants' participation in the "pump-and-dump" scheme, Plaintiff would not have made his investment decisions.

59.     When the Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of UMF Group's publicly-traded stock fell precipitously. The decline in price of UMF Group's stock after the truth came out was a direct and proximate result of the nature and extent of the Defendants' fraud finally being revealed to the public. The timing and magnitude of UMF Group's stock price decline negates any inference that the loss suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff was a direct and proximate result of the Defendants' fraudulent scheme to artificially inflate the price of UMF Group stock and the subsequent decline in their value when the Defendants' prior misrepresentations and other fraudulent conduct was revealed.

<u>Post Relevant Period</u>

60.     UMF Group's November 30, 2017 disclosure published on the OTC Markets website was the Company's final public disclosure on the website. Accordingly, the OTC Markets has designated the Company as "Dark/Defunct."

61.     UMF Group's last filing with the Colorado Secretary of State was a periodic report on December 27, 2017. Accordingly, the Company is noncompliant with the laws of Colorado and is once again delinquent.

62.     On March 7, 2018, an article published on the financial news website *Seeking Alpha* titled "Pretenders and Ghosts: Stealth Promotion Network Exploits Financial Sites to Tout Stocks" reported that a group of writers, both real and fictitious, produced hundreds of promotional materials about companies that were intended to artificially inflate their stock prices. UMF Group was identified in the article as one such company.

63.     In an SEC enforcement action filed on October 2, 2018 in the U.S. District Court for the District of Massachusetts, Case No. 1:18-CV-12058-RGS, the SEC identifies and describes a scheme to engage in securities fraud in which individuals and shell companies concealed their identities and the identities of other various control persons while selling large amounts of stock to investors in the open market. Specifically, the control persons would carry out a "pump-and-dump" campaign to generate public interest in the stock of a company, then secretly "dump" the stock into the market at artificially high prices in circumvention of registration and disclosure requirements imposed by federal securities laws. The SEC lawsuit names UMF Group and its control person(s) as part of the illegal stock sales scheme referenced in that suit.

## COUNT I

**(Defendant Root—Violation of Section 10(b) of the Exchange Act and Rule 10b-5)**

64.     Plaintiff incorporates by reference paragraphs 1 through 63 set forth above as if fully stated herein.

65.     Defendant Root, by use of the means or instrumentalities of interstate commerce or by the mails, in connection with the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts, or omitted material facts necessary to make his statements not misleading; and/or (c) engaged in acts, practices or courses of business which operated as fraud or deceit upon Plaintiff.

66.     Root had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that he failed to ascertain and to disclose such facts, even though such facts were obvious and readily available to him. At the time they were made, such material misrepresentations and omissions were done knowingly or recklessly, and for the purpose and effect of concealing UMF Group's operating condition, business practices, and future business prospects from Plaintiff and the investing public and supporting the artificially inflated price of its stock.

67.     As a result of Root's dissemination of false and misleading information and failure to disclose material facts as set forth herein, Plaintiff acquired UMF Group securities during the Relevant Period at artificially inflated prices and was damaged thereby.

68.     At the time of the misrepresentations and omissions of material facts, Plaintiff was ignorant of their falsity, and believed them to be true. Had Plaintiff known the truth about UMF Group's true intrinsic value and the Defendants' fraudulent scheme, he would not have purchased UMF Group securities.

69.     By reason of the activities described herein, Root violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

70.     As a direct and proximate result of the above-referenced violations, Plaintiff has suffered damages in excess of $85,000, to be proven at trial.

## COUNT II

**(Defendants Ross and UMF Group—Violation of
Section 10(b) of the Exchange Act and Rule 10b-5)**

71.     Plaintiff incorporates by reference paragraphs 1 through 70 set forth above as if fully stated herein.

72.     Throughout the Relevant Period, Defendants UMF Group and Sean Ross carried out a plan, scheme, and course of conduct which was intended to and did: (i) deceive Plaintiff and the investing public; (ii) artificially inflate and maintain the market price of UMF Group stock; (iii) cause Plaintiff to purchase UMF Group Stock at artificially inflated prices.

73.     Defendants Ross and UMF Group, by use of the means or instrumentalities of interstate commerce or by the mails, in connection with the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts, or omitted material facts necessary to make his statements not misleading; and/or (c) engaged in acts, practices or courses of business which operated as fraud or deceit upon Plaintiff.

74.     Defendant Ross is primarily liable as a control person of UMF Group because he (i) is the President, Secretary, Principal Executive Officer, Chairman of the Board of Directors, and as a Director of the Company; (ii) is and has been a majority shareholder of UMF Group at all times during the Relevant Period; and (iii) he knowingly caused the Company to disseminate information to Plaintiff and the investing public which he knew was materially false and misleading.

75.     As a result of the Defendants' dissemination of false and misleading information and failure to disclose material facts as set forth herein, Plaintiff acquired UMF Group securities during the Relevant Period at artificially inflated prices and was damaged thereby.

76.     At the time of the misrepresentations and omissions of material facts, Plaintiff was ignorant of their falsity, and believed them to be true. Had Plaintiff known the truth about UMF Group's true intrinsic value and Ross's fraudulent scheme and true intrinsic value, he would not have purchased UMF Group securities.

77.     By reason of the activities described herein, Defendants Ross and UMF Group violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

78.     As a direct and proximate result of the above-referenced violations, Plaintiff has suffered damages in excess of $85,000, to be proven at trial.

## COUNT III

### (Defendant Ross—Violation of Section 20(a) of the Exchange Act and Rule 10b-5)

79.     Plaintiff incorporates by reference paragraphs 1 through 78 set forth above as if fully stated herein.

80.     Defendant Ross acted as a control person of UMF Group within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his positions as President, Secretary, Principal Executive Officer, Chairman of the Board of Directors, and as a Director of the Company, and by his majority ownership of the Company during the Relevant Period, Ross had the power to influence and control and did influence and control the decision-making of the Company, including the fraudulent content and dissemination of the materials used to carry out the "pump-and-dump" scheme.

81.     By reason of the activities described herein, Ross and UMF Group violated Section 10(b) and Rule 10b-5 by their acts and omissions. By virtue of his controlling position, Ross is liable pursuant to Section 20(a) of the Exchange Act.

82.     As a direct and proximate result of the above-referenced violations, Plaintiff suffered damages in excess of $85,000, to be proven at trial.

WHEREFORE, Plaintiff, Adem Arslani, respectfully requests the following relief from the Court:

A.      Judgment against Defendant Root under Count I for damages in an amount to be proven at trial;

B.      Judgment against Defendants Ross and UMF Group under Count II for damages in an amount to be proven at trial;

C.      Judgment against Defendant Ross with respect to Count III for damages in an amount to be proven at trial;

D.      An award of Plaintiff's costs and fees expended herein, including, but not limited to, a reasonable attorney fee;

E.      Any such additional or different relief as the interests of law or equity may require; and

F.      A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Respectfully submitted,

VALENTI HANLEY PLLC

__/s/ Michael A. Valenti_____
Michael A. Valenti, Esq.
401 W. Main Street, Suite 1950
Louisville, KY 40202
(502) 568-2100

1434 Spruce Street, Suite 100
Boulder, CO 80302
(303) 482-5969
*mvalenti@vhrlaw.com*
Counsel for Plaintiffs, Adem Arslani

## **VERIFICATION**

I, Adem Arslani, Plaintiff in the above-referenced Action, declare under penalty of perjury under the laws of the United States of America, that the facts alleged in the foregoing Verified Complaint are true and correct to the best of my information, knowledge, and belief as of the date hereof.

Adem Arslani